UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| ADRIAN JENKINS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:10-cv-313-TWP-DKL |
| | ) | |
| CUMMINS, INC., | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Adrian Jenkins ("Jenkins"), an African-American male, is a former employee of Defendant, Cummins, Inc. ("Cummins"). While investigating his complaints of harassment by co-workers,  Jenkins was terminated after Cummins determined that he had falsified time records.  Jenkins filed this lawsuit, alleging that his termination was retaliatory or discriminatory and in violation of 42 U.S.C. § 1981,  Title VII of the Civil Rights Act (42 U.S.C. § 2000e-2(a)), and the Americans With Disabilities Act.[1]  Jenkins also claims that he was subjected to a hostile work environment in violation of Title VII and the ADA.

Cummins has filed a summary judgment motion, claiming that no material questions of fact exist and that it is entitled to judgment as a matter of law.  Jenkins has abandoned his claim that Cummins discharged him because of his race or disability, but continues to assert that the discharge was retaliatory and that he was forced to endure a hostile work environment.  Because the Court finds that material questions of fact exists and a reasonable jury could find in favor of

---

[1]Jenkins's Title VII and Section 1981 claims have "identical standards of employer liability," so the Court need not differentiate these claims in its analysis. *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 511 (7th Cir. 1986).

Jenkins, Cummins's motion (Dkt. 34) is **DENIED**.

## I.      *Factual Background*[2]

Jenkins began working for Cummins in Columbus, Indiana as a temporary employee in 2006. After eight months, he became a full-time employee at the Cummins Technical Center ("CTC") in the CVS West Lab working as a cart repairer or car operator.  These were Level Four positions under the collective bargaining agreement that Cummins had with the Office Community Union ("the Union"), to which Jenkins and his co-workers belonged.  Robert McIlree ("McIlree") was the Cummins manager responsible for the area where Jenkins worked. Jenkins also received work assignments from Gavin Wilson ("Wilson"), who held a Level Five union position and was not a member of Cummins management.

Jenkins claims that he was harassed from the outset by co-workers Mike Bledsoe, Adam Brouse, Adam Gray, Carlos Swanson, Jill Cook, Dejaun Mitchell, and Nathan Scott.  The harassment included pejorative name calling, prank phone calls to his wife, racist statements made loud enough for him and his wife to hear while conversing on the telephone, the hiding or taking of a special chair which Cummins provided to accommodate Jenkins's disability, and even unwelcome visits to his home.  At first, Jenkins considered the name calling and teasing to be temporary nonsense or "stupid stuff" that he might have to endure for awhile as the "new guy."  But, unfortunately, the harassment escalated over time.

_____

[2]The facts set forth are either undisputed for purposes of the summary judgment motion or reflect a view most favorable to Jenkins, the non-moving party.

### A.    Name-calling

Jenkins was called several derogatory names over the course of his three-year tenure with Cummins. His co-workers called him names on a daily basis, and also "decorated" his desk, chair, or toolbox with stickers, labels, notes, or other markings bearing the names. Jenkins was called "Pickles," which Jenkins understood to  be a reference to a park in Columbus, which many locals dubbed "Pickle Park" because of reported incidents of homosexual activity. "Pickles" was later expanded to "Pickle Princess" or just "Princess."

Jenkins was also called "Snake" and "Jencum" or "Jenco."  Jenkins claims that this was a reference to his side business, Jen Doc Computer LLC, a computer repair operation.  According to Jenkins, the harassing co-workers called him "Snake" because that is a term used to describe in stereotypical terms young black males who operate businesses.  He contends young black males are considered "snakes in the grass" or crooks.  Jenkins also understood that "Jencum" or "Jenco" were not just used as a "take-off" on his business name, but were references to a street drug  that was concocted from fermented urine and feces and used for "huffing" the fumes.  He reached this interpretation after looking up the meaning of "Jencum" on the internet.  On a couple of occasions, Jenkins found notes on his desk declaring it "Jenco's Cash & Pawn Emporium." In his view, this term was racially-tinged.

In the late 1980's, Jenkins was badly injured in a car accident and incurred a broken pelvis and other injuries that caused him to walk with a limp and suffer almost constant back and leg pain.  To allow Jenkins to work with less pain, Cummins provided him with a special ergonomically correct chair.  That special chair and Jenkins's physical difficulties, which

occasionally required him to seek help with heavier items, caused his co-workers to dub him "Gimpy," "Timmy" and "Brokeback" at various times. Additionally, his co-workers occasionally hid his chair or took it to another area of the building. Presumably, "Timmy" – while not an obvious pejorative like "Gimpy" – is a reference to the animated series "South Park," which is famous for lampooning popular culture, satirizing societal problems, and scathingly poking fun at liberal and conservative viewpoints. "South Park" features a mentally challenged child in a wheelchair named Timmy, and Jenkins and his co-workers had both seen the show. While the name "Brokeback" may have had its genesis in Jenkins's injuries, he actually interpreted the moniker as a reference to "Brokeback Mountain" – the Academy Award winning and critically-acclaimed romantic tale of a forbidden homosexual relationship between two cowboys played by Jake Gyllenhaal and the late Heath Ledger.

### B.      Actions and Verbal Insults

Unfortunately, some of Jenkins's co-workers behaved in a more malicious and intimidating fashion, going further than hiding his chair, calling him names, or "decorating" his work area.  Two or three of the co-workers openly criticized interracial marriage, all while knowing that Jenkins was in an interracial marriage.  A couple of those same co-workers made sexually suggestive comments about Jenkins's wife, both directly to Jenkins and in the background while Jenkins was on the telephone with her. They said things such as "I could have her" or "she needs a good man to satisfy her because Jenkins can not."  In addition, these same individuals telephoned his wife from the workplace on at least three occasions to proposition her to stop by for lunch so that they could "take care of her."

Jenkins wife, Darlene Jenkins ("Mrs. Jenkins"), confirmed that she received telephone calls from three of her husband's co-workers and often heard them in the background making lewd comments. She states that Mike Bledsoe ("Bledsoe") seemed to be the ringleader; specifically, he told her that she needed a white man to satisfy her. During Bledsoe's last phone call, she threatened to call the police. Worst of all, there were occasions when two or more of the co-workers dropped by the Jenkins' home uninvited, and either made fun of Jenkins under the pretext of being concerned about his absence from work or told Mrs. Jenkins that they were there to take her to lunch.

The co-workers placed signs on the back of Jenkins's chair that said Gimpy's or Timmy's chair. Jenkins removed the signs, but co-workers put them back on. On one occasion, a co-worker painted "Timmy's chair" on the back of the chair. Jenkins took photos and then unsuccessfully tried to remove the paint.

Sometimes, the co-workers' conversations devolved into crude vulgarity, and one of Jenkins's antagonists would accuse him of being involved in homosexual activity. For instance, Jenkins was accused of having been absent at the same time as another employee because they had both been injured in an accident that occurred because Jenkins was pleasuring the other employee while riding on the back of his motorcycle. On another occasion it was suggested that Jenkins and his pastor went to the "forbidden closet" and embraced. In addition, the workplace was occasionally adorned with photo-shopped "WANTED" posters that displayed a photo of Jenkins and stated that he was wanted for "sheep molesting."

One incident – which enraged Jenkins and prompted him to lodge a complaint to

Cummins management – occurred when he had to leave work to help out at home due to his wife's medical problem. Someone wrote on the whiteboard located in his work area a statement to the effect that Jenkins's wife "couldn't take a crap" and his kids were "as broke as he is and can't walk home by themselves."

## C.      Plaintiff Reports The Harassment

Cummins purports to have an open door policy allowing employees to report harassment or discrimination to anyone in the management hierarchy.  Mike Harris ("Harris") – Cummins's Human Resources ("HR") Director in a different Columbus, Indiana division – was the first member of Cummins's management to learn of Jenkins's harassment, finding out about it as early as 2007. Interestingly, Harris happened to be Jenkins's pastor and the godfather of Jenkins's children.  Jenkins knew that Harris had a high position with Cummins, but he confided in Harris because he was Jenkins's pastor.[3]  Jenkins and Harris discussed Jenkins's work-related problems in at least ten conversations over the course of two years, and Harris always encouraged Jenkins to report these problems to HR for the area where Jenkins worked.  Jenkins initially chose not to go to HR, however, because of a perceived unwritten union rule barring members from turning in other members.

_____

[3]Jenkins submitted an affidavit stating that he confided in Harris was because he knew he was high enough up at Cummins to prevent retaliation.  However, the affidavit post-dates Jenkins deposition where he clearly stated that "there was one individual I confided in because he was my pastor." It is well-settled that  "[a]ffidavits, though signed under oath by the affiant, are typically . . . written by the affiant's lawyer, and when offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy."  *Beckel v. Wal-Mart Associates, Inc.*, 301 F.3d 621, 623 (7th Cir. 2002).

Jenkins asked his co-workers to "let-up" and to "get off me" on several occasions, but these requests were futile. He went to the Union representatives to seek their intervention, but that was equally futile. Then, in late 2008 or early 2009, after the incident where someone wrote comments about his wife and kids on the whiteboard, Jenkins approached Gavin Wilson ("Wilson"), the Level Five union employee who often assigned work to Jenkins and his co-workers. Jenkins told Wilson that the "teasing" in the lab had gone too far and that he had "had enough." Jenkins asked Wilson to intervene on his behalf and talk with his co-workers.

Wilson had previously noticed the teasing, name-calling, and the occasional signs or notes aimed at Jenkins (including the white board incident). However, Wilson believed the "teasing" to be a "back and forth thing" involving all the members of the team and not based on race or disability. After learning Jenkins's concerns, Wilson agreed to talk to the co-workers. Specifically, Wilson asked them to "cool it down" and stop teasing Jenkins. Wilson claims his comments received a mixed reaction, but he thought he noticed a decrease in the teasing. Unfortunately, from Jenkins's vantage point, it did not fix the problem, so Jenkins approached Wilson a second time. At this time, Jenkins also complained to McIlree, the Cummins manager in his area, showing him the photograph of his painted chair. A formal meeting was held with McIlree, Wilson, and all the team members (other than Jenkins), where the co-workers were again asked to stop teasing and ribbing Jenkins. However, it appears that no one brought this issue to HR's attention.

After the formal meeting, things seemed to subside for awhile; however, Jenkins says it was clear from the looks he was receiving that the co-workers were upset that he had "snitched."

A few weeks later, the harassment began to escalate again, so Jenkins finally reported his issues

to his HR department.  On July 21, 2009, Jenkins approached Holly Kuznicki (" Kuzniki"), an

HR manager with Cummins, to discuss the harassment.  Kuznicki held a closed-door meeting

with Jenkins and Kuznicki's immediate superior, Christina Baldwin ("Baldwin").

### D.    Cummins Investigates

Jenkins described to Kuznicki all the names he was called and all the types of

harassment he had been subjected to, including the phone calls made to his wife.  He showed her

photographs of the vandalized chair, the white board, and the "WANTED" poster.  He informed

her that he felt harassed in part because of his interracial marriage and that the workplace had

become so hostile that he found it hard to come to work each day.  Jenkins provided Kuznicki

with a list of both the harassing individuals on his team and non-harassing employees who had

witnessed the harassment.  Kuznicki understood Jenkins to be sincere, reminded him that the

company had a strict "treatment policy" that required everyone to respect others, and told him

that Cummins had zero tolerance for harassment.  She concluded by informing him that she

would promptly investigate his complaints.

Kuznicki testified that she interviewed McIlree, Wilson, and the employees accused of

harassing Jenkins. She did not interview the non-harassing co-workers who allegedly witnessed

the harassment.  Kuznicki indicates that there were admissions of teasing and ribbing, but that it

was said to be a practice that involved all the team members. Specifically, she was told that

Jenkins had participated in the "two-way street" of ribbing. Jenkins was said to have spoken

often within the team about personal matters, which would prompt some of the teasing. She also

claims to have learned that much of the teasing stemmed from Jenkins's absence during regular working hours. This prompted Kuznicki to investigate Jenkins's time and attendance records, and she sought from Jenkins additional documentation to help establish the accuracy of the hours he claimed to have worked.[4]

Cummins employees report the number of hours they work each week under an honor system. There is no time clock; however, there are core hours for each shift that employees are expected to work. If employees work on a project for which time is specifically recorded, the employees enter a number for the project; otherwise, they enter a general number for their particular work area and submit their time record for the week to their manager for approval. There is a badge swipe and turnstile at two guarded entrances to the building where Jenkins worked to keep undesired individuals from entering the premises. A log book is available at each of the two entrances as well for sign-in purposes if employees don't not have their Cummins badge. There seems to be a consensus that the front gate was guarded more stringently then the "back" gate. On occasion, guards at the back gate would simply "waive in" employees whom they recognized. Jenkins parked near the back and used the "back" gate.

Kuznicki decided to compare Jenkins's time records to his "badge swipes" from the gates and his computer activity record. Although the card swipe does not reflect actual hours that an employee works, she found a discrepancy of more than 250 hours over a three month period of

---

[4]Though disputed by Jenkins, Kuznicki says that when Jenkins first came to her with his complaints, he stated that he assumed he was being investigated relative to his time records and wanted to make his complaints of teasing known to her. Therefore, according to Kuznicki, the issue of Jenkins's "time" was on the table "simultaneous" to his complaints of harassment.

time between May 1, 2009 and July 26, 2009 as to the number of hours he turned in for pay to the time he was apparently on Cummins property.  Meanwhile, co-workers Bledsoe and Mitchell told Jenkins that they would not have mentioned his time issues if he had not gone to HR. Jenkins responded that he was not worried because he had not turned in any time which he had not worked. He has also testified that everyone in the shop knew the best way to get someone in trouble was to say something about their time, because there was no time clock to verify employee attendance.

When Kuznicki discussed the time discrepancy with Jenkins, he informed her that he was often simply "waived in" at the back gate by guard Patsy Cox ("Cox") especially during the time periods when he was on crutches.  Jenkins brought Kuznicki work sheets which he had created to show that he was working on various dates at the facility. However, because the work sheets were not time stamped or recorded in a fashion that would substantiate the timing of that work, she found them unreliable.  Kuznicki interviewed Cox, who indicated that she knew Jenkins and that there may have been a few times when she allowed him through the gate without swiping a badge or signing the log book, but it would not have been a regular event.  In the end, Kuznicki concluded that the large number of hours involved in the discrepancy could only mean that Jenkins had falsified his time sheets.

At the close of her investigation, Kuznicki determined that there had been "teasing" of Jenkins about "personal issues" while he was at work, but it amounted to little more than joking. Therefore, no individual corrective action was recommended.  She did, however, recommend that the team be provided with training with a theme of "these things will get you fired."  She

also recommended that Jenkins be terminated for falsifying his time records.  Her

recommendation was accepted by management and Jenkins was fired on August 31, 2009.

## II.   *Summary Judgment Standard*

Summary judgment is appropriate when the record shows that there is "no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56©; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning

material facts are genuine where the evidence is such that a reasonable jury could return a verdict

for the non-moving party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  In

deciding whether genuine issues of material fact exist, the court construes all facts in a light most

favorable to the non-moving party and draws all reasonable inferences in favor of the

non-moving party.  *See id.* at 255. However, neither the "mere existence of some alleged factual

dispute between the parties," *id*., 477 U.S. at 247, nor the existence of "some metaphysical doubt

as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586

(1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Illinois,

Inc*., 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits; nor is it a vehicle for

resolving factual disputes.  *Waldridge v. Am. Hoechst Corp*., 24 F.3d 918, 920 (7th Cir.1994).

Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if

genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion,

summary judgment is inappropriate.  *See Shields Enterprises, Inc. v. First Chicago Corp*., 975

F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).

But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

### III.   *Discussion*

Jenkins asserts that he was discharged in retaliation for complaining of race and disability-based harassment.  He claims that it was easier for Cummins to fire the complaining employee than it would have been to fire or discipline all of his harassers.  Clearly, much of the harassment by Jenkins's co-workers had no genesis in race, disability, or his interracial marriage;[5] rather, it was a type of harassment or teasing aimed at irritating its target regardless of race or disability.  However, it is the protected activity of complaining of a hostile work environment based upon race or disability that is central to a retaliation claim (not whether the complaint can be substantiated).  Furthermore, there were clearly offensive comments voiced and actions taken that were based upon Jenkins's interracial marriage and his physical limitations.  Therefore, in deciding the merits of Cummin's summary judgment motion, the Court must look to the proof requirements for a discrimination claim founded upon the employer

---

[5]The Seventh Circuit has not specifically decided if discrimination based upon a person dating or being married to an individual of another race is actionable under Title VII and 42 U.S.C. § 1981.  In 2005, it assumed such discrimination was actionable because the appellee had made this assumption, but the court noted it was not deciding the issue as a matter of law. *Ineichen v. Ameritech,* 410 F.3d 956, 962 (7th Cir. 2005).  However, this Court is convinced by the decisions  from other circuits that such discrimination is actionable. *See e.g., Parr v. Woodmen of the World Life Ins. Co.,* 791 F.2d 888, 891-92 (11th Cir.1986) ( "[w]here a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of his race").

allowing a hostile work environment to exist.[6]

As noted by Cummins, Jenkins has failed to respond to Cummins's contention that he admitted in his deposition that Cummins took no action against him on the basis of his race or disability. Therefore, the only remaining claims relate to retaliation and hostile work environment.

### A.     Hostile Work Environment

In order to successfully pursue a hostile work environment claim, Jenkins must show that: (1) he was subjected to unwelcome harassment; (2) because of his race or disability; (3) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive work environment; and (4) there is a basis for employer liability. *Bellino v. Peters,* 530 F.3d 543, 551 (7th Cir. 2008);*Luckie v. Ameritech Corp.,* 389 F.3d 708, 713 (7th Cir. 2004).

Cummins argues that the co-workers' conduct is not sufficiently connected to race or disability to allow him to satisfy the second element of his claim. The Court agrees that much of the alleged race-based animus is not objectively race-based. For example, Jenkins may believe, as he stated in his deposition, that there is a widespread stereotypical view that young black

---

[6]The Seventh Circuit has not determined whether a hostile work environment claim is cognizable under the ADA because resolution of that issue has not been necessary; however, when such a claim has been part of a lawsuit, the appellate court has assumed that the proof requirements under the ADA would be the same as those under Title VII, which does allow for individual civil actions based upon a hostile work environment. *Mannie v. Potter,* 394 F.3d 977, 982 (7th Cir. 2005). This Court will assume as well that a hostile work environment claim under the ADA would require the same elements of proof as would such a claim under Title VII.

males who own businesses are "crooking," and that this stereotypical bias led to signs stating "Jenco's Cash and Gold  Emporium" and the insult "Snake." However, this claim is based on speculation, not evidence.

And even if the court assumes that the names "Jenco" and "Snake" were used to express a particular person's racial bias, the third element of proof requires a showing that the severity of the conduct engaged in was so subjectively and objectively severe and pervasive as to alter the conditions of employment.  *Smith v. Northeastern Illinois University,* 388 F.3d 559, 566 (7th Cir. 2004). With respect to the use of "Jenco," "Jencum," "Snake,"  "Pickles," or "Pickles Princess" – in name calling or on signs – Jenkins would not be able to cross the threshold of objectivity when it comes to assessing their severity as race or disability-based conduct. The names are perhaps vulgar and insensitive (not to mention unfunny), but they cannot satisfy this standard.

But other names, comments, and conduct were objectively hostile and based on race and/or disability.  An objectively offensive workplace is one in which a reasonable person would find it hostile or abusive.  *See Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993).  A reasonable person could find that several people calling someone "Gimpy," "Timmy," or "Brokeback" on a daily basis is objectively hostile and degrading, especially to someone with physical limitations or injuries.  Moreover, the act of hiding Jenkins's chair, one which specifically accommodated his pain and physical limitations, could also be viewed as objectively hostile to a reasonable person.

Further, there is inherent race-based hostility in a conversation, in voices loud enough for Jenkins to hear, regarding the alleged ills of interracial marriage.  One could chalk this up to a

mere poor choice of topics for discussion at work. But this is hard to swallow, given that these same people made lewd and suggestive comments within earshot of Jenkins regarding his wife. Such comments included statements made directly to her over the phone and in person, with at least one person stating that she "needed a white man."  A reasonable jury could find that these comments and actions were sufficiently hostile and intimidating to alter the conditions of Jenkins's work.

According to Jenkins, he continued to do good work and received good reviews until his termination. However, because Jenkins did not heed Mike Harris's recommendation to go to his particular HR representative, an argument could be made that Jenkins did not find his workplace subjectively hostile enough to alter his conditions of employment. But this argument is undercut by the fact that, during the last six months of his employment, Jenkins took numerous measures to make it known within his team and to management that he could not take the ongoing harassment.  If believed, that evidence is sufficient to support a claim that the work environment was sufficiently subjectively hostile.

Finally, there is the question of whether there is  sufficient evidence to support  attaching liability to Cummins.

> The standard for employer liability hinges on whether the harasser was the plaintiff's supervisor.  Harassment by a supervisor of the plaintiff triggers strict liability, subject to the possibility of an affirmative defense where the plaintiff suffered no tangible employment action. Conversely, the employer may be found liable for a hostile work environment created by an employee who was not the plaintiff's supervisor only where the plaintiff proves that the employer has "been negligent either in discovering or remedying the harassment."

*Hrobowski v. Worthington Steel Co.,* 358 F.3d 473, 477 (7th Cir. 2004)(quoting, *Parkins v. Civil*

*Constructors of Illinois, Inc.,* 163 F.3d 1027, 1032 (7th Cir. 1998)).  Where co-worker

harassment is at issue, the employer has discharged its duty if it takes reasonable steps to

discover and rectify the harassment. *Berry v. Delta Airlines,* 260 F.3d 803, 811 (7th Cir. 2001).

The Court believes that a reasonable jury could find that several factors lead to a

conclusion that the company was negligent in discovering and rectifying the harassment,

including: (1) Harris's failure to approach anyone else at Cummins with regard to at least ten

complaints he received from Jenkins;[7] (2) McIlree's own knowledge of, and apparent failure, to

promptly report to HR Jenkins's complaints, his photo evidence, and the meetings with

employees regarding teasing; (3) Kuznicki's failure to interview any of the non-harassing

employees who allegedly witnessed the harassment; and (4) Kuznicki's failure to provide any

summary of her interview (if one was conducted) with McIlree.

Cummins seeks to downplay the seriousness of the activity by referring to it as "teasing."

Indeed, this is how the those who were accused of committing it or permitting it referred to it in

interviews.  A more thorough investigation would have included at least some attempt to

interview other co-workers about what they saw or heard, not just the accused co-workers. In

short, the investigation consisted predominately of queries to those accused of harassment.

Obviously, those individuals have every incentive to deny or downplay the seriousness of

---

[7]This situation raises interesting  questions about what a reasonable person in a high
management position is required to do when he learns of potentially discriminatory activities
going on in the workplace as a result of his relationship outside the workplace and whether the
company's "open-door" policy is implicated. Were this the only evidence of neglect on the part
of Cummins, or were it the evidence that tipped the scale in the eyes of the Court, the scope of
that duty would warrant deeper reflection.  Notably, neither side has offered any precedent on
the issue, and the Court has found none in its search.

wrongdoing.

In the end, there are material questions of fact as to whether the alleged harassment, both racial and disability-based, was subjectively and objectively severe enough to constitute a hostile work environment.  There are also fact questions as to whether Cummins took reasonable steps to discover and address the harassment.  Accordingly, summary judgment is not appropriate with respect to Jenkins's hostile work environment claim.

**B.      Retaliation**

Jenkins contends that after he complained to Kuznicki about race and disability-based harassment and a hostile work environment, Cummins decided it would be easier to get rid of him than it would be to fire or discipline all of the co-workers involved.  If true, that would indeed be retaliation.  There are two routes a plaintiff may pursue with a retaliation claim:

> The plaintiff may establish a prima facie case of retaliation and overcome defendant's motion for summary judgment using either the direct method or the indirect method. Under the direct method, the plaintiff must present direct evidence of (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two.
>
> Under the indirect method, the plaintiff must show that (1) [he] engaged in a statutorily protected activity; (2) [he] performed [his] job according to [his] employer's legitimate expectations; (3) despite [his] satisfactory job performance, [he] suffered an adverse action from the employer; and (4) [he] was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  If the plaintiff establishes these elements, the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for its adverse action. Although the burden of production shifts to the defendant under this method, the burden of persuasion rests at all times on the plaintiff.  Once the defendant presents a legitimate, non-invidious reason for the adverse action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual.

*Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003)(citations omitted).  If a court finds that a plaintiff has established a prima facie case under the direct method, there is no need for it to examine the elements constituting the indirect method.  *See Stone v. City of Indianapolis Public Utilities Div.,* 281 F.3d 640 (7th Cir. 2002).

Jenkins contends that, under the direct method, there is more than sufficient evidence to allow him to avoid summary judgment.  First, regardless of whether or not the harassment or teasing was sufficient to constitute a hostile work environment, by complaining to Kuznicki about the harassment and indicating his belief that he thought it was based in part upon his interracial marriage and his disability, Jenkins clearly engaged in protected activity.  *See Pickett v. Sheridan Health Care Center,* 610 F.3d 434, 441 (7th Cir. 2010).  The second element is also satisfied because Jenkins was fired, which is the quintessential adverse employment action.  As to the third element, whether there is a causal link between the two, Jenkins relies on circumstantial evidence, which is permissible.  *Sylvester v. SOS Children's Villages Illinois, Inc*., 453 F.3d 900, 902 (7th Cir.2006).

Circumstantial evidence can be any type of proof that allows for an inference of retaliation.  *Id*. at 903.  Suspicious timing, ambiguous statements, actions taken with regard to employees similarly situated, and other "bits and pieces" from which an inference of discriminatory intent might be drawn are among the types of circumstantial evidence that may illustrate an inference of retaliation on the part of the decision-maker. *Troupe v. May Department Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994).   However, inferences that are supported by mere "speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Village of*

*Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).  Moreover, mere suspicious timing between

protected activity and an adverse employment action is not enough to establish a genuine issue

of material fact. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008).

In Jenkins's case, there is no question that the timing of the investigation into his time

records and his firing are suspicious.  Jenkins was fired less than six weeks after he made his

complaint to Kuznicki in HR on July 21, 2009.  Within days of that complaint, he was told an

investigation into his time records was being conducted.  Nothing had ever been said to Jenkins

about his time and attendance prior to his complaint to Kuznicki, and Kuznicki herself testified

that there was no issue with Jenkins's time records until he made his complaint.

> Q.    So Mr. Jenkins' own complaint is the reason  you began investigating him; is that correct?
>
> A.    We were --
>
>  MR. GAIDOO: Objection, vague. Go ahead and answer.
>
> A.    We investigated the complaints, and as we were investigating the complaint of the teasing, the time issue did come up, so that was also investigated.
>
> Q.    But it was even before you started the  investigation, right? It was when Mr. Jenkins  came into our office, you're telling me,  aren't you? Didn't you tell me that earlier that it was during that initial conversation that simultaneously you decided let's investigate his timekeeping records?
>
> MR. GAIDOO: Objection, mischaracterizes prior testimony.
>
> MR. KENT: I think that's what she said, but go ahead.
>
> MR. GAIDOO: Go ahead and answer.
>
> A.    The investigation was going on. The issue of  time came up in that investigation.
>
> Q.     You told me earlier it was simultaneously, did you not?
>
> A.    I did.
>
> Q.    Okay. So was it simultaneously or did the investigation into his time start sometime after, after -- excuse me -- after he made his initial complaint?
>
> A.    The time -- Adrian's time was not looked at until he, he made his complaint.

As noted previously, suspicious timing alone is insufficient to avoid summary judgment, so the Court must look to see if other "bits and pieces" of evidence complement the suspicious timing and support a conclusion that Jenkins complaint and his firing could be causally connected.  Of some relevance is the fact that Jenkins had always been considered a good employee and received good reviews.  Furthermore, McIlree received Jenkins's weekly time sheets for approval prior to Jenkins submitting them and never questioned Jenkins reporting.  Moreover, Cummins admits that the card swiping stations and log books at the entrances are not intended for use as time-keeping mechanisms.  And, there is evidence that the antagonistic co-workers actually instigated the investigation into Jenkins's hours. Once prompted, the focal point of Kuznicki's investigation changed from a harassment investigation to a time record investigation.  She rejected documents provided by Jenkins which may have shed some light on when he was working, because she deemed them unreliable without some form of time stamp or time verification.

In the end, the picture painted by the evidence of record could potentially lead a reasonable jury to conclude that there was a causal relationship between Jenkins making a complaint of a hostile working environment, based in part on race and disability, and his being terminated from employment with Cummins. Accordingly, Plaintiff's retaliation claim survives summary judgment.

**IV.     Conclusion**

For the reasons explicated in this entry, Defendant's Motion For Summary Judgment (Dkt. 34) is **DENIED**.

IT IS SO ORDERED this day: 03/26/2012 _____.

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Copies to:

Craig M. Borowski
FAEGRE BAKER DANIELS LLP -
Indianapolis
craig.borowski@faegrebd.com

Daniel LaPointe Kent
LAPOINTE LAW FIRM P.C.
dkent@lapointelawfirm.com

Mary Jane Lapointe
LAPOINTE LAW FIRM PC
maryj@lapointelawfirm.com